**PINK v. STATE et al.**
No. 8366.

Court of Civil Appeals of Texas. Austin.
Feb. 24, 1937.

Appellee's Motion for Rehearing Denied
April 28, 1937.

White, Taylor, & Gardner, of Austin, for plaintiff in error.

Wm. H. Flippen, of Dallas, and Powell, Wirtz, Rauhut, & Gideon and Everett L. Looney, all of Austin, for defendant in error.

McCLENDON, Chief Justice.

Appeal (by writ of error) from a final judgment closing a receivership of the Texas properties of National Surety Company. The only complaint of the judgment is of that portion which allowed to the receiver and his attorney $40,000, as final compensation for their services in addition to what they had previously received amounting to $27,150; in all $67,-150.

The causes leading up to the receivership are thus stated in appellant's brief:

"The National Surety Company had its headquarters in the City of New York and conducted a nation-wide surety business.

"As a part of its business the National Surety Company guaranteed the payment of certain collateral trust bonds and real estate mortgages issued by various loan companies throughout the United States. These loan companies were engaged in the business of making loans on real estate, and to facilitate the carrying on of said business, and to obtain funds therefor, such loan companies entered into trust indentures with certain banks and trust

companies, under the terms of which the loan company would transfer to the bank or trust company the real estate notes and mortgages securing the same, and bonds would be issued by the loan company secured by the collateral which had been transferred to the bank or trust company as trustee. The payment of these bonds would then be guaranteed by the National Surety Company, after which the bonds were sold to the public. In these trust agreements the loan company agreed to make collection of payments of principal and interest on the original loans, to see that taxes were paid and insurance kept in force, and to service the loans generally.

"It was also the obligation of the Mortgage Company to keep the pledged collateral in current condition. As the original borrowers defaulted the Mortgage Companies were called upon by the trustees to make good such defaults. This they did so long as their resources lasted, and then calls were made upon the National Surety Company by reason of its guarantees.

"As the force of the depression increased, it became apparent that the National Surety Company could not rely upon the indemnity of the Mortgage Companies but that it must take steps to preserve the mortgaged properties back of its guarantees and thus reduce as much as possible the impending liability upon its guarantees. For the purpose of acting for it in its dealings with the Mortgage Companies and in its care and preservation of the mortgaged property, the National Surety Company organized a subsidiary known as the Greyling Realty Corporation. This subsidiary then entered into agreements with the trustee banks and trust companies by which it undertook the servicing of the mortgages held by the latter as trustees. Defaulted mortgages were frequently delivered by the trustees to Greyling Realty Corporation upon letters of indemnity signed by the National Surety Company. Upon foreclosure of these mortgages, in the absence of satisfactory cash bidders, the Greyling Realty Corporation took titles to the mortgaged property in the name of its nominees. These nominees would then execute new mortgages which were delivered to the original trustees from whom the original mortgage had been obtained on the indemnity agreement mentioned, any deficiency being paid the trustee in cash.

After the loan was thus refinanced, the nominees conveyed the titles to Greyling Realty Corporation, or its nominees, subject to the new mortgage.

"The Greyling Realty Corporation arranged for the direct servicing of the loans in the State of Texas to be undertaken by the Mortgage Servicing Company. In many foreclosure sales in this State the title was taken by Lewis Barber, Texas Properties, Inc., and Interstate Mortgage Company, as the nominees of the Greyling Realty Corporation.

"In passing, let us call the court's attention to the fact that practically all of this property was encumbered by liens held by the original trustees which exceeded the value of the property, and that the original trustees were entitled to all of the net rents arising from said properties for the purpose of crediting same upon the bonds guaranteed by the National Surety Company. It is therefore apparent that any diversion of this real estate, or the rents therefrom, from the original trustees and placing same among the general assets of the National Surety Company would reduce the security held by its secured creditors leaving them with a larger unsecured claim.

"The bonds guaranteed by the National Surety Company totaled many millions of dollars, and the demoralization of real estate values and rentals, in Texas and through the Nation, caused such a flood of defaults in the mortgages and bonds guaranteed by the National Surety Company that it became unable to respond on its guaranties and was forced into rehabilitation on April 29, 1933. This necessarily cut off the source from which the Greyling Realty Corporation received funds to carry on its operations, and its receivership inevitably followed. The Texas Properties, Inc., the Mortgage Servicing Company, and the Interstate Mortgage Company were also forced into receivership, and E. N. Maher was appointed receiver thereof by the 95th District Court of Dallas County, on about May 1, 1933."

In the New York proceeding the state insurance commissioner was appointed statutory liquidator (variously referred to as receiver or rehabilitator) of the surety company. Immediately after his appointment the liquidator requested the Texas board of insurance commissioners to immediately apply for a receiver to preserve the assets and wind up the affairs of the surety company in Texas. Pursuant to that request the Attorney General instituted this (quo

warranto) proceeding in the name of the State, on April 29, 1933. On the same day the court appointed Orville S. Carpenter receiver, fixing his bond at $10,000; and Carpenter qualified May 1, 1933. On that day, upon application of the receiver, John W. Miller, of Dallas, was appointed his attorney. The court promptly made a monthly allowance of $350 to the receiver and $500 to his attorney. The surety company had on deposit with the state treasurer $50,000 in United States bonds. These were under appropriate court orders taken over and sold by the receiver. May 25, 1933, the receiver petitioned the court to require Maher, the Dallas receiver, to deliver the assets held by him to Carpenter. This motion was granted June 8, 1933. This order was complied with. July 27, 1933, the court approved a contract between the receiver and the New York liquidator, under which the Texas receiver was to take over and administer all assets of the surety company in Texas, pay all necessary expenses under order of the court, and transmit the balance to the liquidator; it being agreed that Texas creditors would share in the proceeds upon an equal basis with all other creditors. The contract contained the following clause:

"4. Whenever the Rehabilitator or Liquidator, as the case may be, shall certify to the Texas Receiver that he intends to make a final distribution to creditors, the Texas Receiver shall, with the approval of the Texas Court, transmit all of the assets in his possession, after the deduction of the expenses of the Texas Receiver, to the Rehabilitator or Liquidator."

September 18, 1933, the court authorized the receiver to enter into contract, effective as of June 1, 1933, with Management Company of Texas, Inc., for servicing the real estate in the hands of the receiver. The pertinent portions of this contract are thus summarized by appellant:

"The service contract between the receiver and the Management Company provided that, from and after June 1, 1933, the Company would act as a servicing agent and manage for the receiver all of the real estate which the receiver had taken over from those formerly servicing the same, exercising general supervision over tenants for the collection of rents and care of the property and paying taxes and insurance for a commission of 3½% of the gross rentals collected by it. The property covered by the contract was divided into two classes,— the unencumbered and the encumbered.

Out of the net rents collected by the Management Company from the unencumbered property, it was required by the contract to deduct its 3½% commission and pay the balance to the receiver, but out of the net rents collected from the encumbered property it was provided that the Company should deduct its 3½% commission, 'and pay over the balance thereof to the trustees under the bonds covering the mortgages in question only after a fee of $200.00 per month, commencing August 1, 1933, is deducted first from said rents and paid to the receiver, and a like sum of $200.00 per month, commencing August 1, 1933, is paid to attorney John W. Miller, it being distinctly understood and agreed that the receiver and his attorney take the position that the receiver's fee and the attorney's fee in the sum of $200.00 per month each, as aforesaid, are being deducted as a portion of the administration cost of the Texas receivership. In this connection the receiver shall have the right to and will inspect and audit at such intervals as he may elect, the local records involving all transactions covered by this contract, and said attorney further agrees to render such services as may be necessary to protect the interest of the receiver and the local servicing agency, exclusively, however, of court litigation, it being the receiver's position as well as a fact that a substantial part of the receiver's time and the attorney's time will be taken up in supervising and managing the properties herein involved, and that such duties are a part of the administration of the affairs of the National Surety Company, the expense of which should and will be borne by the rentals in question before said rentals are paid to the trustees."

Under this contract and the previous order of allowances the receiver and his attorney appear to have received during the first year of the receivership $11,800; to which the court added for the first year's services $7,500; making in all for that year $19,300. Upon application of the receiver and his attorney the previous court allowances of $350 and $500 per month, respectively, were each reduced by $200, thus bringing their monthly allowances, including that received from the servicing company, to the original figures allowed by the court. The receiver's final account shows that the entire amount paid to him and his attorney, exclusive of the $40,000, was $9,050 and $11,300, respectively (total, $20,350), to which should be added $6,800 ($3,400 to each) received from the servicing company; in all $27,150.

The following is a résumé of the entire receipts and disbursements of the receiver as shown by his final account:

"RECEIPTS

| | | |
|---|---|---|
| Proceeds of sale and interest on qualifying Deposit with State Treasurer....... | $ 54,065.60 | |
| National Surety Co.—Bank Account...... | 2,592.30 | |
| National Surety Co.—Salvage Collections | 10,405.74 | |
| Balance of April and May, 1933, rents received from E. N. Maher, Rec.......... | 15,508.45 | |
| Balance of funds received from E. N. Maher, Rec. ............................. | 2,063.48 | |
| Expense refunds paid from rents......... | 109.00 | |
| Rents on Receiver's properties............ | 1,643.17 | |
| Quitclaim Deed to various Trustees...... | 25,495.00 | |
| Proceeds from Sales of Real Estate: | | |
| Corpus Christi Place........... $ 2,677.93 | | |
| Coleman Property ............. 158.15 | | |
| Porter Farrell Sale........... 749.98 | | |
| Willie Johnson Sale............ 6,553.83 | | |
| C. L. Gladden Sale............ 6,304.70 | | |
| M. E. Bradford Sale........... 22.09 | | |
| Lillie Mae Spangier Sale...... · 660.68 | 17,127.36 | |
| Total receipts reported.... | $129,410.10 | |

DISBURSEMENTS

| | | |
|---|---|---|
| Fees of Administration | | |
| Receiver ........................ $29,050.00 | | |
| Attorney ........................ 31,300.00 | | |
| Master .......................... 500.00 | | |
| Auditor ......................... 250.00 | $ 61,100.00 | |
| Travel allowances of Receiver and Attorney .................... | 4,082.51 | |
| Receiver's Office Expense | | |
| Salaries of office assistants... $ 2,369.50 | | |
| Office Supplies ................. 241.47 | | |
| Postage ......................... 62.50 | | |
| Rent ............................ 500.00 | | |
| Telephones and Telegrams.... 836.34 | | |
| Premium of Receiver's Bond.. 100.00 | | |
| Rent on Deposit Box........... 14.39 | | |
| Taxes on Checks............... 6.16 | | |
| Typewriter for Receiver's Office 93.15 | | |
| Filing Cabinet for Receiver's Office ......................... 20.00 | 4,243.51 | |
| Receiver's Miscellaneous Expense | | |
| Hauling Files and Storage.... $ 31.00 | | |
| Notary Fees ..................... 23.25 | | |
| Serving Notices ............... 7.00 | | |
| Court Reporter ................. 24.00 | | |
| Commissions .................... 100.00 | | |
| Court Deposits ......:........... 50.00 | | |
| Costs in Receivership......... 405.15 | | |
| Taxes—Mortgage Ser. Co..... 200.49 | | |
| Taxes—Interstate Mortg. Co... 45.00 | | |
| Recording Fees ................. 137.00 | | |
| Miscellaneous Expense ....... 169.26 | | |
| Atty. Fee to Worsham et al... 100.00 | | |
| Paid First Nat. Bank—Ft. Worth ....................... 325.24 | 1,617.39 | |
| Paid out to Lienholders and Expenses from Sales of Real Property | | |
| Corpus Christi Place.......... $ 2,677.93 | | |
| Porter Farrell Sale............: 236.98 | | |
| Willie Johnson Sale............ 5,818.96 | | |
| C. L. Gladden Sale............ 5,641.63 | 14,375.40 | |
| Total Disbursements reported .................... | $ 85,418.81 | |

SUMMARY

| | |
|---|---|
| Total Receipts, as reported.... | $129,410.10 |
| Total Disbursements, as reported ......................... | 85,418.81 |
| Sent to Liquidator by Receiver ......................... | $ 43,991.29." |

Appellant contends that the order approving the final account and making the $40,000 additional allowance was without notice or hearing. In this connection we quote from appellant's brief:

"We wish to place the emphasis of this appeal upon our first assignment of error to the effect that the compensation allowed the receiver and his attorney herein is excessive and exorbitant. If this court decides that the receiver and his attorney earned the fees allowed them, the Liquidator does not wish to have the case reversed on any technical grounds. We wish to state frankly that the other assignments of error are brought forward in our brief merely to make sure we were presenting sufficient technical grounds to give the court ample jurisdiction."

In view of this contention regarding notice and hearing, we make the following statement:

In his final report, after reciting the above quoted section 4 of the contract with the liquidator, the receiver says:

"In connection with said clause above quoted, your Receiver reports that the Liquidator has not yet certified to him that he intends to make a final distribution to the creditors, but your Receiver respectfully suggests that it will be for the best interests of the estate for the assets described therein to be forthwith transmitted to the Liquidator of the National Surety Company, without prejudice, however, and without waiving the other terms and conditions of said written contract."

The court's order upon this part of the report was: "That section 4 of the above contract referred to be modified so as to permit the said Orville S. Carpenter as Receiver to effect such transfer at this time rather than to await certification by the Liquidator to the effect that such Liquidator intends to make a final distribution to creditors."

This report was filed and order of approval entered December 24, 1934.

The application of the receiver for additional final allowance of compensation to himself and to his attorney was filed and granted December 21, 1934. The application recites that he and his attorney had

each devoted the "major portion" of his time to the affairs of the receivership. No request for any specific amount was made. In fixing the amount ($20,000 to each), the order recites:

"The Court being personally mindful of the nature,. extent and value of the services rendered by said Receiver and by said Attorney in conducting the affairs of the estate, and being further fully advised by appropriate evidence of such services, and after taking into consideration the nature, extent and value of the property involved, the complications and difficulties encountered, the time expended, the labor and skill, knowledge and experience devoted by the Receiver and said Attorney; the responsibilities assumed, and the amounts heretofore paid to them as compensation, and the results obtained, is of the opinion and so finds. * * *"

There is no further recitation in any of the orders regarding notice or hearing.

March 30, 1935, the liquidator filed his petition for writ of error and bond. April 24, 1935, he presented to the trial judge a bill of exceptions reciting the following regarding the receiver's final report and application for additional compensation:

"That no order of the court was ever entered setting said report and applications down for a hearing and directing notice thereof to be given to all interested parties, that none of said reports, applications or motions were ever entered on the motion docket of said court, and that no notice of the filing of said report and said applications was given to the defendant herein or to its said liquidator or to any of the other interested parties; that the hearing on said report and applications was ex parte and informal; that no formal testimony was adduced before the court, and no reporter was present to transcribe the proceedings, and that no one was present at the time said reports and applications were presented to the court except said receiver and his attorney."

The judge refused to approve the bill; whereupon the liquidator requested him to certify his reasons for such refusal. This was also refused. The liquidator then requested the judge to "prepare, approve and file such bill of exceptions as he deems correct, but that the said judge refused to do so and further refused to endorse his refusal on said bill of exceptions or put the same in writing, and stated that he would not approve any character of bill of excep-

tions for defendant." All this is shown by properly verified bystanders' bill of exceptions. There is nothing in the record to controvert the factual recitations of this bill of exceptions, further than may be inferred from a bill of exceptions later allowed by the judge on behalf of Carpenter and Miller, which reads:

"Be it remembered that at the hearings on the matters preliminary to the presentation of the Receiver's Final Reports on the financial affairs of the Estate, and preliminary to the presentation of the joint application for final compensation of the Receiver and his Attorney, and at the hearings on said reports and application, evidence was offered by the Receiver and his Attorney, showing that they were closing the estate pursuant to a plan agreed upon between the Receiver and the Liquidator and other interested parties, while in New York City around October 1, 1934, later confirmed in writing, and that the agents and attorneys in Texas acting for the Liquidator and other interested parties delegated to carry out said plans for closing the receivership, had with the Receiver, selected the week commencing December 17, 1934, in which to close the receivership estate; that said agents and attorneys aforesaid assisted in outlining the procedure incidental to closing the estate, including the conveyance of the real estate held by the Receiver, the filing of the final reports and the application for final compensation, it being the desire of all concerned to close the receivership prior to December 25, 1934; that the Receiver and his Attorney gave actual personal notice to said agents and attorneys of the filing of the application to terminate the receivership, or that same were being filed; that the active intervenors or their attorneys were actually personally notified by the Receiver or his Attorney to be present at said hearings; that Joel Berry, an Attorney of Houston, Texas, representing the Reorganization Managers of the Real Estate Bond Issues guaranteed by the National Surety Company, the holders of which bond issues represented the majority, insofar as amount is concerned, of the creditors of the National Surety Company, was given actual personal notice to be present at the hearings in question; that a group of Austin Attorneys, including Honorable Ireland Graves, which group represented creditors holding approximately a quarter of a million dollars in principal amount of real estate bonds guaranteed by National Surety Company, was given actual

personal notice by the Receiver or his Attorney, that final reports were being filed and was invited to be present at the hearing involving the final compensation of the Receiver and his Attorney; that Robert Sansom, an Attorney of Fort Worth, Texas, representing a Trustee Bank holding over $200,000.00 of principal amount of real estate securities guaranteed by National Surety Company was given actual personal notice to attend the hearings on the final report of the Receiver and the application for final compensation."

Each side has extensively briefed the question of notice and hearing, both from the standpoint of existence and necessity, vel non. In the conclusions we have reached, we deem it unnecessary to consider these questions. The above statement from the record is for the purpose of giving a picture of what happened from the viewpoint of the respective parties.

■ Appellees insist that we cannot review the trial court's action in fixing the amount of compensation in the absence of a statement of facts. Ordinarily, this would be true. It appears reasonably clear, however, that there was not a hearing upon the amount of additional compensation; and that this was arrived at from the judge's personal knowledge of the services rendered and their value. Appellant has brought up the entire record in the proceedings, showing every pleading and motion filed and order entered by the court. This record does reflect, and clearly so, we think, the purpose of the receivership, the general nature and extent of the assets, and the general character of the services rendered.

The receivership was clearly an ancillary one to the main receivership in New York. Its object and actual accomplishment was to take over the Texas assets of the surety company, manage and administer them to the best advantage, and deliver eventually the net proceeds to the New York liquidator. The estate was a large one requiring technical skill and administration ability in its proper handling. That the receiver and his attorney had such skill and ability, and successfully and satisfactorily met every requirement both as to ability and results is not questioned. The total amount brought into the estate other than from the property serviced by the servicing company was approximately $125,000.

Appellees lay much stress upon the fact that including receipts from rents ($424,-754.44) collected and transmitted by the servicing company to trustees holding prior liens upon the serviced real estate, the "total assets and property reduced to his possession" by the receiver amounted to $639,-464.54. It is to be borne in mind, however, that the entire details of administering this property were performed by the servicing company under contract with the receiver approved by the court; for which the servicing company received 3½ per cent. of the sums collected. The duties of the receiver and his attorney in regard to this property were thereby limited to seeing that proper accounting was rendered by the servicing company. It was recognized that the cost of servicing and the additional compensation due the receiver and his attorney in connection with this property should be borne by proceeds from the property, and should not be charged against the general assets of the estate. The contract therefore provided for such compensation and fixed the amount at $400 per month ($200 to each). Under this contract the receiver and his attorney received $6,800 (17 months at $400).

The receiver and his attorney were allowed various sums for traveling expenses, office rent and supplies, secretarial and clerical assistance, auditing, etc., as appears from the above account of the receiver. The compensation allowances made to them must therefore be regarded as net for their services. Nor was there any element of contingency involved.

■ In fixing allowances, "the governing principle is that the compensation allowed a receiver should be measured by the reasonable value of his services; the court may and must allow him reasonable compensation; and he is entitled to that, and no more." 52 C.J. 386.

The same is true as regards compensation to his attorney.

In applying this rule, the considerations which should be held in mind were thus stated by this court in Brand v. Denson, 81 S.W.(2d) 111 (error dis.):

"In equitable proceedings of this character, 'the court should be cautious not to award excessive or improper allowances, whereby just criticism may be provoked; the allowance should be confined within the limits of the resultant benefits ensuing equally to all having a common interest, and of which all must necessarily avail themselves.' 49 A.L.R. 1153, note; Strang v. Taylor [82 Ala. 213, 2 So. 760] supra. The amount of such fees is not fixed by contract, but is measured by the reasonable

value of the services rendered. 'The circumstances to be considered in determining the compensation to be recovered are the amount and character of the services rendered; the labor, time, and trouble involved; the nature and importance of the litigation or business in which the services were rendered; the responsibility imposed; the amount of money or the value of the property affected by the controversy, or involved in the employment; the skill and experience called for in the performance of the services; the professional character and standing of the attorney; the results secured; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee when it is to be contingent than when it is not.' 6 C.J. 750-752; Texas Oil & Land Co. v. Hanszen (Tex. Civ.App.) 292 S.W. 563."

After a very careful review of the record, and having in mind every favorable consideration regarding the high character of the services rendered, the responsibility assumed, and the results accomplished, and with all deference to the views of the trial judge, we have reached the conclusion that the $40,000 additional allowance is out of all proportion to the value of the services rendered; and that an allowance to each for the twenty months of their service upon the basis of $10,000 a year would afford ample, if not in fact liberal, compensation. We have reached this conclusion upon the assumption that all the time of the receiver and his attorney was required during the twenty-month period; although the receiver reported only the "major portion" of such time as so employed.

There are many adjudicated cases upon this subject. The general principles applied are the same, although there is a wide divergence of decision in the application of those principles to particular cases and situations. Some of the decisions cited were in proceedings in other jurisdictions involving winding up the affairs of the Southern Surety Company. We do not regard the amounts fixed in these cases as furnishing a fair criterion for our guidance in the instant case. Nor do they present sufficient factual bases for a reasonable comparison.

We are satisfied of the high character, standing, ability, and capacity of the receiver and his attorney. We have given great weight to these considerations, as well as to the efficient manner in which they have performed their arduous duties. We judicially know from the public records of this State [Houston Printing Co. v. Tennant (Tex.Civ.App.) 76 S.W.(2d) 762] that from August 1, 1935, to February 14, 1936, Mr. Carpenter served the State as state auditor at a salary of $4,282 a year; that on the latter date he became director of the Old Age Commission at a salary of $5,000 a year; and that later he became director of the Unemployment Commission at a salary of $7,500 a year. We do not regard these salaries as a necessary or even proper criterion in fixing his compensation as receiver. We assume that for considerations highly commendable he accepted these positions and served his State, at a financial sacrifice to himself. We do think, however, that $10,000 per annum is ample, if not liberal, compensation for his services. And this, even disregarding the fact that the services as receiver were rendered during 1933 and 1934, when salary levels were appreciably lower than they are today.

The record shows that, aside from the $40,000 allowance, the receiver has received $12,450, or $4,216.67 short of $10,000 per annum, and his attorney $14,700, or $1,966.67 short of $10,000 a year. If within fifteen days the receiver will remit $15,783.33 and his attorney $18,033.33 of the $20,000 additional compensation each has been allowed, the judgment and order appealed from will, as so modified, be affirmed. Otherwise, said judgment and order will be reversed and the cause remanded as to the $40,000 additional compensation.

Reversed and remanded unless remittitur is filed.

### On Appellees' Motion for Rehearing.

Appellees' initial assignment of error in their motion is prefaced by the statement:

"We desire to present what we consider to be fundamental error although perhaps not having heretofore been called directly to the attention of the court."

The assignment reads:

"The court erred in that it did not dismiss this appeal because of the fact that it appears from the face of the record that the plaintiff in error is Louis H. Pink, statutory liquidator of the National Surety Company, under appointment of a court of proper jurisdiction in the State of New York (being one and the same and performing the same offices as a receiver under the laws of Texas); and the record further reflects that neither he nor his predecessor in office, Geo. S. Van Schaick, had intervened in this cause or in any wise become a party hereto or sought or obtained

permission to prosecute this appeal by writ of error or otherwise; therefore, the party prosecuting this appeal by writ of error does not have the capacity to so prosecute the same or any standing in the courts of Texas."

In support of this assignment, appellees rely upon the holding in Moseby v. Burrow, 52 Tex. 396, and Malone v. Johnson, 45 Tex.Civ.App. 604, 101 S.W. 503, to the effect that a foreign receiver cannot act in his official capacity beyond the jurisdiction of the appointing court; and such receiver has no power to maintain an action in the courts of this state. Also cited are articles 2294 and 2313, R.C.S. This holding and these statutes manifestly have no application to the situation at bar.

As pointed out in our original opinion, this was an ancillary receivership, brought by the Attorney General upon the request of the state insurance department, the latter upon the request of the New York liquidator (receiver). Under the contract between the Texas receiver and the New York liquidator, approved by the court without any objection upon the part of any creditor or other party to the litigation, the assets of the surety company, after administration by the Texas court, were to be transmitted to the liquidator for distribution among creditors. That the court had the power to enter the order approving the contract cannot be seriously questioned. That order judicially fixed the status of the liquidator as the party entitled to receive from the Texas receiver the balance of the estate in his hands at the close of the Texas administration. Clearly, we think the liquidator was as much a party to the proceeding for the purposes set forth in the order as if he had formally requested and been granted leave to intervene.

Concededly the trial court was not bound to recognize the agreement, nor to permit the assets of the estate to be turned over to a foreign receiver to be distributed to creditors under orders of a court in a foreign jurisdiction. But having confirmed the agreement providing for such transfer upon request or with the acquiescence of all interested parties, the liquidator became a party to the proceeding and the ultimate representative of the creditors and the corporation in receivership. Lloyds Ins. Co. v. State (Tex.Civ.App.) 98 S.W.(2d) 259 (error refused).

The motion is overruled.

Overruled.